N4HVJIAC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    JIANGSU HUARI WEBBING LEATHER
     CO., LTD.,
4
                    Plaintiff,
5
                v.                        23 Civ. 2605 (JLR)
6
     JOES IDENTIFIED IN SCHEDULE A,
7    et al,

8                   Defendants.           Conference

9    ------------------------------x
                                          New York, N.Y.
10                                        April 17, 2023
                                          4:05 p.m.
11
     Before:
12
                    HON. JENNIFER L. ROCHON,
13
                                          District Judge
14
                          APPEARANCES
15
     FAIRCHILD LAW, LLC
16        Attorneys for Plaintiff
     BY:  STEVEN R. FAIRCHILD
17        -AND-
     J. ZHANG AND ASSOCIATES, P.C.
18   BY:  JIYUAN ZHANG

19   LEASON ELLIS LLP
          Attorneys for Defendant Hyponix Brands Ltd.
20   BY:  ROBERT M. ISACKSON

21   ROSENBAUM FAMULARO & SEGALL P.C.
          Attorneys for Defendants Ninjasafe and Trailblaze Products
22   BY:  CORY JAY ROSENBAUM

23   TARTER KRINSKY & DROGAN
          Attorneys for Defendant Sell Below Cost USA LLC
24   BY:  SANDRA A. HUDAK

25

N4HVJIAC

1            (Case called)

2            THE COURT:  Who do we have for the parties, please?

3            For plaintiff?

4            MR. FAIRCHILD:  Good afternoon, your Honor.

5            My name is Steven Fairchild.  Mr. Zhang is supposed to

6   be coming.  I don't know why he's --

7            THE COURT:  Thank you, Mr. Fairchild.

8            And who do we have representing defendants?

9            MR. ISACKSON:  Robert Isackson on behalf of Hyponix

10  Brands Ltd.

11           THE COURT:  Good afternoon, Mr. Isackson.

12           MR. ISACKSON:  Good afternoon, your Honor.

13           THE COURT:  Just make sure the green light is lit.

14           MS. HUDAK:  Sandra Hudak of Tarter, Krinsky & Drogan,

15  on behalf of Sell Below Cost USA LLC.

16           THE COURT:  Good afternoon, Ms. Hudak.

17           MR. ROSENBAUM:  Good afternoon, your Honor.

18           Cory Jay Rosenbaum, for Defendant 42, which is Ninja;

19  and also Defendant 67, Trailblazer.

20           THE COURT:  Terrific.  Thank you very much.

21           Okay.  We have several things to take care of today.

22  I want to address some things.  I'll let everybody be heard.  I

23  just want to put some background on the record first.

24           By way of background, the Court held a hearing on

25  March 31st, 2023, and heard argument from plaintiff on whether

N4HVJIAC

1   a TRO should be granted.  The Court entered an *ex parte* TRO on

2   April 4th, 2023.

3           On April 13th, 2023, the Court received a letter from

4   plaintiff requesting an extension of the TRO and requesting an

5   adjournment of the hearing scheduled for today on the

6   preliminary injunction, which is April 17th.

7           On April 14th, the Court received a memorandum of law

8   in opposition to plaintiff's letter from defendant Hyponix.

9   That letter explained the defendant was made aware of the

10  lawsuit through Amazon.  I understand that defendant Hyponix

11  reached out to plaintiff to discuss the lawsuit, including the

12  reasons why it believed its product was not infringing on

13  plaintiff's patent.  Defendant Hyponix also opposed any delay

14  of the April 17th hearing and asked for an opportunity to show

15  why its product did not infringe plaintiff's product.

16          Also on April 14th, 2023, plaintiff filed a notice of

17  voluntary dismissal, which, as drafted, appeared to apply to

18  the entire case.  That's at ECF No. 16.  It states:  "This

19  action is voluntarily dismissed."  The Clerk of Court has

20  requested clarification and order of the Court before

21  processing this dismissal, given that it is unclear.  It may be

22  that it applies simply to Defendant Hyponix, but we'll discuss

23  that here today.

24          I also understand that plaintiff contacted Amazon to

25  reinstate Hyponix's account, and that's at ECF No. 17.

N4HVJIAC

1          Defendant Hyponix filed its own motion on April 14th,

2    requesting permission to move for extraordinary relief and to

3    be heard at today's hearing, which was granted to appear here

4    today.  The Court denied plaintiff's request to adjourn the

5    hearing on April 14th, and granted, as I mentioned, Hyponix's

6    request to appear.  More papers were filed today, including

7    another filing by plaintiff concerning what I assume is

8    Hyponix, although it's listed as Defendant No. 59, Monkey Line,

9    which is not corresponding with the chart submitted by

10   plaintiff.  Ninja Safe and Trailblazer, other defendants have

11   also submitted papers, and Sell Below Cost has just filed an

12   appearance.

13          So I'm going to deal with a few items first, and then

14   we're going to -- I'm going to hear from the three defendants,

15   as well as from the plaintiff, regarding their positions.

16   We're going to deal with the extension of the TRO, which is

17   scheduled to expire tomorrow, the request for the PI.

18          But before we do, I am going to address two items:

19          One, plaintiff stated it was serving companies other

20   than Amazon, such as ebay.com, wayfair.com, walmart.com, and

21   alibab.com with the TRO at ECF No. 13.  And the Court's order

22   only addressed -- the TRO that was entered only addressed

23   Amazon.

24          Mr. Fairchild, was this TRO served on other entities

25   besides Amazon?

N4HVJIAC

1        MR. FAIRCHILD:  I believe they were just being made

2   aware of it.

3        THE COURT:  Would you push the button.

4        MR. FAIRCHILD:  I think it was just to let the other

5   companies know -- or the selling distributors know that it was

6   happening, your Honor.  I think that's what it was, your Honor.

7        THE COURT:  Okay.  Well, I will presume that they read

8   the order which did not provide any injunction or request for

9   expedited behavior by any of the third-party platforms other

10  than Amazon.

11        MR. FAIRCHILD:  If I may, your Honor.

12        Yes, you're correct.  And to my knowledge, none of the

13  other distributors stopped any sales of any other platform.

14        THE COURT:  Okay.  Good.  Because that was made clear

15  in the first part of my order in footnote 1.  I'm not sure why

16  the plaintiff needed to inform them of an order that did not

17  apply to them; but just I want to make clear here in court and

18  to plaintiff that that order did not apply to anyone other than

19  Amazon.

20        The second thing I want to address is sealing.  The

21  Court sealed plaintiff's complaint and the exhibits and the *ex*

22  *parte* application and the supporting declarations.  And at that

23  time, plaintiff sought that it be sealed to allow five days

24  after service of the April 4th order or until the PI hearing

25  was held, which is today.  Those five days have passed, and

N4HVJIAC

1    today is the scheduled PI hearing.  The Court didn't receive

2    any further application that would justify continued sealing

3    and, moreover, the parties to this action have been prevented

4    from seeing materials that were filed in this case.

5           Given the First Amendment, which accords a strong

6    presumption of public access to pleadings and other judicial

7    documents that have historically been open to the press and

8    general public and play a significant positive role in the

9    functioning of the judicial process, I will be unsealing this

10   record today.  *Next Caller v. Martire*, 368 F. Supp. 3d 663 at

11   666 (S.D.N.Y. 2019).  I'm also noting that presumptive right of

12   access prevails, unless it is overcome by specific

13   on-the-record filings that sealing is necessary to preserve

14   higher values and only if the sealing order is narrowly

15   tailored to achieve that aim.  *Next Caller v. Martire*, 368 F.

16   Supp. 3d 663 at 666 (S.D.N.Y. 2019).  I find that the plaintiff

17   has not met that standard, and the Court will unseal the docket

18   effective today.

19          All right.  I think the easiest thing would be now to

20   hear from -- I was going to hear just from Hyponix, but I think

21   there are others that I want to hear from as well.  Again, on

22   the table is the extension of the TRO, extension of time to

23   move on the PI.  And I think the easiest thing may be to hear

24   from each of the defendants, first on their positions just

25   generally in this lawsuit, and then I'll hear from plaintiff.

N4HVJIAC

1          But before I do, I want to make sure we have now in

2     the courtroom Mr. Zhang, is that accurate?

3          MR. ZHANG:  Yes, your Honor.

4          THE COURT:  You can stand when you speak, please.

5          MR. ZHANG:  Yes, your Honor.

6          THE COURT:  Thank you.

7          And Mr. Zhang, will you be addressing this primarily

8     or Mr. Fairchild?

9          MR. ZHANG:  Yes.

10          THE COURT:  Who, you or Mr. Fairchild?

11          MR. FAIRCHILD:  In collaboration, your Honor.  I can

12     help with more of the patent things.  He knows far more about

13     what's going on with the client and any settlement negotiations

14     that would happen, your Honor.

15          THE COURT:  Okay.

16          Mr. Zhang, then, it's your understanding as well that

17     we are here because you're seeking to extend the TRO and you

18     would like more time on the preliminary injunction.  I presume

19     that you haven't served parties; is that correct?

20          MR. ZHANG:  Your Honor, because of our still waiting

21     the email confirmation, the messages from the other platforms,

22     right now we only have received the emails, the address -- the

23     email addresses from the defendants from No. D001 to D064.

24          THE COURT:  One moment.

25          And how is it that you'd be receiving anything from

N4HVJIAC

1  D65 to D163, since they've not been ordered to produce

2  anything?

3          MR. ZHANG:  Because I have served the TRO orders to

4  the platforms regarding the defendants from 65 to the last one,

5  163.  But I'm still waiting a response from the platforms and

6  it gave me the emails.  And therefore, I can serve them the

7  notice of the hearing date and the pleadings and the documents.

8          THE COURT:  So you were not here when I started this

9  hearing.  But you do understand that the TRO that I entered did

10  not apply to anyone other than Amazon; that's the only platform

11  it applied to.

12          MR. ZHANG:  Yes, your Honor.

13          THE COURT:  So why would any of the other platforms be

14  responding to the TRO that you sent to them?

15          MR. ZHANG:  Because according to the TRO orders, the

16  language on the TRO orders, it says on the paragraph -- on the

17  order, the first -- the first paragraph, temporary restraining

18  order, to my understanding, this order is against like the --

19  to remove the listings on all the platforms.

20          THE COURT:  It is not.  It is not.

21          If you look at the order, it is against -- Amazon is

22  the only third-party platform.  And footnote 1 talks about how

23  this has been narrowed to amazon.com only.  And your colleague,

24  Mr. Fairchild, confirmed that this morning -- or at the

25  beginning of this hearing.

N4HVJIAC

1        MR. ZHANG:  Okay.

2        THE COURT:  Okay.

3        All right.  Let's just make sure that that's clear.

4        All right.  Let's move forward next to hear from

5   Hyponix.

6        Can I hear from you?  I've gotten your papers, but I'd

7   like to hear from you here today.

8        MR. ISACKSON:  Thank you, your Honor.

9        Do you want me to address from here or the podium?

10       THE COURT:  Wherever you're comfortable.  There is

11  fine, as long as the microphone is on.  That's fine.

12       And this is Mr. Isackson.  Yes.  Go ahead.

13       MR. ISACKSON:  So may it please the Court, first, I

14  represent Hyponix only in this case.  My comments are directed

15  to Hyponix in the case against it.

16       Hyponix is based in Surrey British Columbia.  It's

17  been in business for a number of years.  With respect to the

18  public record and the evidentiary submissions we made today, my

19  declaration and the declaration of Gevin Rai, the president of

20  Hyponix, we believe that it's sufficient for the Court to

21  consider the matters it's entitled to consider under Rule

22  12(b), Rule 56, and the instant motion that's before the Court

23  to extend time for the TRO and the preliminary injunction, to

24  actually rule on the merits at this point.  Because we will

25  establish that there are indisputable facts, and that it will

N4HVJIAC

1    be impossible for plaintiffs to amend the complaint in order to

2    lodge a claim of infringement against my client and, therefore,

3    the case should be dismissed with prejudice.

4            I'm prepared to go through the nuts and bolts of it,

5    your Honor.

6            THE COURT:  Before you do, Mr. Isackson, the

7    preliminary question that I was looking at is plaintiff has

8    filed a notice of voluntary dismissal with respect to your

9    client.  As I mentioned, the clerk has held on that momentarily

10   because it was a little unclear as to whether it was for the

11   entire case, which I will now confirm whether it was or not, or

12   just to your client.

13           But given that, I know plaintiff's position is that

14   you may not have the ability to move for relief.  I assume

15   you're going to disagree, so I may need a little bit more

16   information.

17           But before we go there, Mr. Isackson, Mr. Zhang, was

18   your motion for voluntary dismissal — and you can stand when

19   you speak — intended to dismiss this entire case or just the

20   case as against Hyponix?

21           MR. ZHANG:  Your Honor, we just dismissed the specific

22   defendant, Hyponix, in this matter.

23           THE COURT:  Okay.  All right.

24           Now, Mr. Isackson, can I have your view on that.

25           MR. ISACKSON:  First off, your Honor, I confess, I did

N4HVJIAC

1    not have time to complete my legal research.  My understanding

2    is that in the Second Circuit, there is a split of authority as

3    to whether a voluntary dismissal under Rule 41 of less than all

4    defendants in the case is sufficient to trigger the automatic

5    dismissal of the action.  So I don't know where your Honor is

6    on that point; but I do know that there is a split of authority

7    within the Second Circuit.  And there also is a circuit split

8    amongst the circuits as to whether or not the voluntary

9    dismissal is suitable.

10          In any event, we believe that if that's the case, then

11   under Section 285 of the patent act, which states in full:

12   "The court, in exceptional cases, may award reasonable attorney

13   fees to the prevailing party."

14          On the plain language of the statute, a dismissal

15   would make Hyponix a prevailing party, and the Court would be

16   entitled to hear the issue of whether this case should be

17   deemed exceptional and, if so, whether in its discretion to

18   award attorneys' fees and expenses.  In addition, the Court

19   also retains jurisdiction over plaintiff to address the issue

20   of sanctions for its litigation misconduct in the way that this

21   whole case has been handled.

22          THE COURT:  Okay.  I think the easiest thing may be --

23   so I'll tell you now that I'm not prepared to rule right now,

24   because I'd like to look at the authority, I'd like to get

25   further information from you, either here today or if you'd

N4HVJIAC

1    like to submit something with some research and some case law

2    regarding your ability to seek the relief that you're seeking

3    and precisely what relief you'd like to seek, and I will

4    entertain that.  I just want to make sure I have complete

5    information before I rule.

6         Would you like to make any more of a presentation here

7    today or would you like to put it in on the papers?

8         MR. ISACKSON:  Your Honor, I would like to make a

9    presentation on two issues at this point, in light of your

10   comments, and then submit the rest in writing.

11        The first is the issue of whether plaintiff has

12   carried their burden on establishing that they have suffered

13   irreparable harm in the absence of an injunction.  And I

14   believe that their memo of law, docket 6 — and again, I can

15   only look at the public documents because they haven't been

16   unsealed as of yet; and although we requested copies, we were

17   not provided with them — they provide the following timeline:

18        By the second half of 2019, plaintiff's hanging

19   exercise product was "widespreadly recognized in the U.S.

20   market."  Docket 6 at 18, citing to a declaration that was

21   filed under seal in support.  Plaintiff's annual profits were

22   about three to four million dollars, they say.  Others then

23   entered the global marked in the latter half of 2020, and

24   caused a "sharp decline in sales" resulting in "annual losses

25   of a million dollars by 2022."

N4HVJIAC

1    Plaintiff attributed this to "competitor's low prices

2    and low quality products dominating the market."  Again, docket

3    6.  And it's unclear whether there's any evidence in support of

4    this statement.

5    The asserted patent, 11,478,673, which I'll typically

6    refer to as the '673 patent, issued on October 25th, 2022.  The

7    complaint, docket 1 — I don't have the amended complaint; I

8    haven't seen it — asserts a single claim, which is patent

9    infringement based on the '673 patent.  There's no claim of

10   trademark, no trade dress, no unfair competition, nothing else.

11   If you take a look at what they argue, the present

12   record shows that they cannot carry a likelihood of irreparable

13   harm in the absence of an injunction because prior to October

14   25th, 2022, there was no legal patent right to exclude

15   competition, so there could not have been any counterfeiting,

16   as alleged by plaintiff, docket 6 at 18.  There was

17   competition, but it was fair and permitted, because there was

18   no patent right.  And as I mentioned, there's no trademark

19   claim of counterfeiting.  So plaintiff simply hasn't supported

20   its argument about there being counterfeiting generally; and it

21   certainly hasn't submitted any evidence with respect to

22   Hyponix's conduct being any kind of counterfeiting or problem.

23   THE COURT:  What about after October 2022?

24   MR. ISACKSON:  That becomes an issue of whether

25   there's infringement, your Honor.  But the point is that their

N4HVJIAC

moving papers concede that any economic and competitive harm

that plaintiff had suffered from 2019, when it was at the peak

of its earning power, through October 24th, 2022, when it was

losing a million dollars a year annually, was the result of

fair and legitimate competition, unprotected by any patent

rights.

　　　　So the infringement, to the extent there is any — yet

to be determined — began on October 25th.  But by then,

plaintiff's business had already declined to the point where it

claims it was losing a million dollars annually.  In other

words, the harm alleged as irreparable was harm already

suffered prior to the patent issuing, and their evidence

doesn't support any claim of irreparable harm arising from the

lack of an injunction.

　　　　Importantly, plaintiff made fundamental changes to the

scope of the patent protection during prosecution of the '673

patent, and it forfeited its rights to claim reimbursement for

any infringement that may have occurred after the application

published before the patent was granted in October of 2022.  By

making substantial changes to the claim language, they lost the

ability to recover damages for that period.  So, again, any

competition that occurred prior to October 24, 2022, was

legitimate and fair, and cannot be a cause for irreparable

harm.

　　　　And what plaintiff failed to establish is any change

N4HVJIAC

1    in its economic or competitive position from October 25th,

2    2022, through today.  There's no causality between the alleged

3    competition and infringement and their alleged irreparable

4    harm.

5             THE COURT:  Talk to me a little bit more.  Will you go

6    back a little bit about the patent changing and how that

7    affects your argument.

8             MR. ISACKSON:  It doesn't, your Honor.

9             To the extent they would try to make an argument that

10   the provisional rights of a patent publishing gives them a

11   right to claim infringement damages, they forfeited that right

12   by amending the claims and making substantial changes.

13            THE COURT:  So it only became operative essentially in

14   October of 2022.

15            MR. ISACKSON:  October 25th, 2022, that's correct,

16   your Honor.

17            THE COURT:  And it's your position that they were not

18   harmed from October 25th, 2022, at least irreparably, because

19   the harm had already occurred prior to that date?

20            MR. ISACKSON:  That's correct.  Plus, they haven't

21   provided any evidence to suggest that since October 25th, 2022,

22   they've suffered or are likely to suffer any greater harm than

23   there already existed at that point in time.

24            THE COURT:  Thank you.

25            MR. ISACKSON:  Okay.  Next point.

N4HVJIAC

1          As counsel for –– forgive me.

2          THE COURT:  Take your time.  There are a lot of ––

3          MR. ISACKSON:  Moving parts.  Some happened today,

4    your Honor, yes.

5          THE COURT:  I saw.

6          MR. ISACKSON:  This is counsel for Trailblaze.  Very

7    nicely wrote in his brief filed this morning or today the

8    argument regarding the failure to meet burden of preliminary

9    injunction at docket 29, starting at page 4, We agree and

10   adopt.  And I'll just address a couple of points on top of

11   that.

12         He cites to the *Takeda Pharmaceutical* case, 967 F.3d

13   1339 (Fed. Cir. 2020), for the four factors that need to be

14   considered in connection with a preliminary injunction.  I

15   believe under this Court's jurisprudence, that also applies to

16   a temporary restraining order.  You have to prove the same

17   elements.  Plaintiffs did not address *Takeda* factor No. 3, that

18   the balance of equities tips in his favor, and I would like to

19   address that now.

20         Plaintiff could have filed this action anytime after

21   October 25th, 2022, but it did not.  It waited.  Hyponix began

22   selling its modified product in November of 2022, shortly after

23   the patent issued.  Plaintiff waited another four months.  It

24   wasn't until late March 2023, in spring, at the beginning of

25   the sale season, where families start to think about buying

N4HVJIAC

outdoor products for their children, that they decided to

launch this massive exercise to exclude their competition.

So plaintiff raced to the Court five months after

their patent issued to try to stop competition that they've

known about since 2020.  And they moved *ex parte* to seek a TRO

without notice and, frankly, in violation of this Court's Local

Rule 3M, requiring a meet-and-confer against Hyponix and the

other defendants.

As Gevin Rai, the president of Hyponix, said in his

declaration, there are a number of elements of harm that

Hyponix will suffer due to a wrongful takedown on Amazon.  He

identified six:

Lost opportunities.  While your product is unavailable

on Amazon, potential customers may turn to competitors'

offerings, leading to lost sales and missed opportunities for

building a loyal customer base.

No. 2, impact on brand image.  The takedown may create

a negative perception of your brand among customers who might

associate the removal with poor quality or other undesirable

factors, damaging your brand's reputation and value.

No. 3, increased advertising and marketing costs.  In

order to rebuild your product's visibility and sales momentum,

you may need to invest more in advertising and marketing

efforts once the product is reinstated on Amazon.

4, strained supplier relationships.

N4HVJIAC

5.   Unable to place future purchase orders due to the halt on disbursements from Amazon.

And 6, decreased sales ranks, which hurts further performance on Amazon.

And then there are the unknowns that's generally acknowledged by people who sell on Amazon, that Amazon has algorithms for treating you as a customer.  And when you have products taken down, your ability to sell on Amazon suffers.

So, as a result, there is a balance of hardships on irreparable harm that we respectfully submit favors Hyponix. Given that Hyponix continued to invest in this product while plaintiffs, obviously aware of it and its patent rights, sat on those rights, lying in the weeds, waiting for the start of the spring selling season for outdoor products, to sneak into court without fair notice and shut down competition before Hyponix — and presumably some of the other defendants — had a chance to stop the train wreck of an Amazon takedown.

One more point on this.  Hyponix sales price, according to Exhibit D063, is $199.79.  The Hyponix product has a rating of 4.5 out of 5 on Amazon.  Mr. Rai confirms that this is accurate in his declaration at paragraph 11.  The Court may notice that it is also one of the more expensive products presented on the Amazon web page that is Exhibit D63.  It's higher than plaintiff's price, which Mr. Rai attests is $122.98.

N4HVJIAC

1          We submit that Hyponix's price being higher than

2     plaintiff's price and its high-quality rating is

3     self-explanatory; and it doesn't meet the "low prices and

4     low-quality products" allegation in plaintiff's papers.  Docket

5     6 at 18.

6          On the foregoing, we submit that the public record

7     establishes that plaintiff has failed to meet a burden of

8     causing irreparable harm and it is not entitled to either a

9     temporary restraining order or a preliminary injunction.

10          As to Hyponix, there's absolutely no evidence that

11     Hyponix's sales of products was causing irreparable harm to

12     plaintiff that would support a temporary restraining order as

13     to Hyponix, let alone preliminary injunction.  Rather, the

14     evidence seems pretty clear that the reverse is what's

15     happened.

16          THE COURT:  Thank you, Mr. Isackson.

17          MR. ISACKSON:  Now, if the Court would permit, I'll

18     move to the noninfringement position.

19          THE COURT:  Yes, that's fine.  Thank you.

20          MR. ISACKSON:  To do that, I'd like to hand up some

21     demonstratives.

22          THE COURT:  I'm going to mark for identification

23     purposes Court Exhibit 1, which are two metal pieces.  Court

24     Exhibit 2 is a document that says:  The only buckles that will

25     not tear the slack line over time.  Don't risk your safety.

N4HVJIAC

1   And Exhibit 3 is U.S. Patent No. '673B2, claim 1.

2              Mr. Isackson, you may proceed.

3              MR. ISACKSON:  Thank you, your Honor.

4              Okay.  As to whether plaintiff can carry its burden to

5   establish a likelihood of success on the merits, we submit that

6   it cannot.  Again, I'm just addressing plaintiff's claims

7   against Hyponix.  Either plaintiff and its counsel didn't do a

8   reasonable and adequate pre-suit investigation, they didn't

9   understand the patent, or they knew and didn't care about the

10  facts and just threw Hyponix into the pot of however many

11  defendants they sued to shut down all online platform

12  competition — certainly the vast majority of consumer sales

13  these days are online — and trying to keep all the hanging

14  exercise product business for itself.

15             If you would turn to what you've marked as Court

16  Exhibit 3, it's a two-sided document.  The page that has the

17  yellow highlighting, I put claim 1 of the '673 patent.  And

18  what I've done is I've highlighted in yellow the elements of

19  the claim we contend are not found in the accused Hyponix

20  product.

21             The underscored text reflects language that was

22  changed during prosecution, from the original claim to the

23  claim in the form in which it was allowed.  Some of the claims

24  were made by the applicant, some were made by the patent

25  examiner; but all of the claims were made before the patent was

N4HVJIAC

1      found allowable over the prior art, and granted and issued.

2              On the lower half of the page, I've included two

3      images of the patent drawing '673, figures 2 and 3, which I've

4      color-coded with the box shown below.  And on the right side of

5      the page there's two photographs.  The lower photograph is the

6      hardware that the Court has marked as Court Exhibit 1; and the

7      upper photo with the red belt is an image of an assembled

8      Hyponix product which -- as attested to by Mr. Rai's

9      declaration in one of his paragraphs, I don't have that

10     citation handy, your Honor, but it's in there.

11             So if we can go back to the top, the first part of the

12     claim is a preamble.  And it says:  A walking flat belt

13     comprising a mounting member, a sling body, a hanging obstacle,

14     and a correcting member.  This is the preamble, and it

15     references a system or a flat belt that has four different

16     parts:  A mounting member part, a sling body part, a hanging

17     obstacle, and a connecting member.  And this will become

18     important when we get to something called the doctrine of

19     equivalence.

20             The next element that I want to turn to is the second

21     paragraph, which is the mounting member.  This says:  The

22     mounting member is mounted to the sling body and comprises a

23     rectangular-shaped buckle and a flat strap to receive the

24     rectangular-shaped buckle.

25             So Hyponix doesn't have these things.

N4HVJIAC

1          Importantly, the examiner amended the claim, claim 1

2     here, to add the rectangular shape limitation, to modify the

3     shape buckle, thus narrowing the scope to a rectangular-shaped

4     buckle.

5          If you turn to the other side -- sorry.  If you turn

6     to, yeah, the other side of the demonstrative, Court Exhibit 3,

7     this is two excerpts from the prosecution history.  And at the

8     bottom of the page, below where it says "amendment dated March

9     6," that is actually a snip from the prosecution history from

10    an examiner's amendment dated May 20th, 2022, in the notice of

11    allowability, where the examiner makes the change to delete the

12    character that's in the quotes, where the language says claim

13    1, lines 4 to 5, quote, the mounting member comprises a, quote,

14    and then there's a graphic there.  That apparently is a Chinese

15    character.  And the examiner amended the claim to delete that

16    character and replace it with the word "rectangular."

17          So the examiner determined that needed to be changed

18    and, thus, narrowing.

19          If you look at the '673 patent, the specification

20    makes clear that a rectangular-shaped buckle was one species of

21    a mounting member that was disclosed in the patent.  You can

22    see this if you look at the specification, at column 1, lines

23    57 to 66.  So the claim here was limited to a preferred

24    embodiment of a rectangular-shaped buckle as opposed to other

25    shaped buckles.

N4HVJIAC

1          So if we go back to claim 1 and look at the third

2    paragraph in the claim, it talks about "the rectangular-shaped

3    buckle, including."  This just sets up a definition for that

4    claim limitation, which has the following components.  And we

5    can look at all those components together.  And all these

6    components define what is a rectangular-shaped buckle that's

7    covered by the claim.  And the claim defines the invention.  So

8    anything that's not covered by the claim is outside the scope.

9    It's free for everyone to practice.

10          So these elements are a mouthpiece element made of a

11    pair of horizontal members and a pair of vertical members.

12          And let's stop there for a minute.

13          Those lines are underscored; so, again, that was an

14    amendment made during prosecution.  Those words were added to

15    limit the scope of the claim, which means that those words are

16    important and they have to be there; you can't just ignore them

17    when you're trying to read the claim on the accused product.

18          If you turn to the other side of Court Exhibit 3,

19    you'll see there the amendment at the top of the page that was

20    made, where applicant changed the language to insert the pair

21    of horizontal members and a pair of vertical members as part of

22    the definition of the mouthpiece element, which is part of the

23    rectangular-shaped buckle.

24          The next limitation down is a partition element

25    located in the mouthpiece element.  If you look at the images

N4HVJIAC

1   down below, your Honor, I've color-coded the rectangular buckle

2   in Figure 3, where the vertical members are in blue, the

3   horizontal members are in purple, and the partition member is

4   in green, which you could just see the two edges; it's

5   underneath the red strap.

6           THE COURT:  I see.

7           MR. ISACKSON:  Okay.  Thank you, your Honor.

8           The next element is the two ends of the partition

9   element are connected with the vertical members of the

10  mouthpiece element, to form one integral piece.  That's a

11  feature of the claim that has to be there for there to be

12  infringement.  So that green element 6 has to be connected to

13  the blue elements in order to have something that's within the

14  scope of the claim.

15          The next element is the partition element divides an

16  area enclosed by the mouthpiece element to a first connection

17  area and a second connection area.

18          So there are a couple of things going on here.

19          You've got the mouthpiece element is enclosed in area.

20  So that's what the partition has to divide.  So what that says

21  is that the combination of the vertical and the horizontal

22  pairs make an enclosed area that's partitioned by partition 6.

23  And that makes two connection areas.  The first connection area

24  7, and a second connection area 8.

25          Then the next limitation there -- are you with me,

N4HVJIAC

1   your Honor?

2                   THE COURT:  I am.

3                   MR. ISACKSON:  Okay.  Thank you.

4                   The next is a wherein clause.  Which, wherein, as a

5   result of the aforementioned structure, you end up with one end

6   of the flat strap passes through the first connection area,

7   then passes over the partition element, and then passes through

8   the second connection area, and is connected with another end

9   of the flat strap.

10                  So if you look at figure 3, that's what that shows.

11  You've got the red strap goes up through one end -- one open --

12  one open connection area, over the partition, down the other

13  connection area, and that strap is secured together at the end,

14  making a closed loop about the partition area.

15                  If you turn to -- well, if you just look at the photo

16  on the right side of Court Exhibit 3 on the first page, it has

17  the red strap, it has the shaped structure — which I seemed to

18  have misplaced my version of, the M-shaped structure.  Here it

19  is.  And it has the carabiner.  And these are not an integral

20  piece; they are pretty separate.  They can't get more separate.

21                  When you connect this and put it on the strap -- give

22  me a moment.  I don't get this all over the courtroom.  You

23  don't thread it through the end, like you do with a buckle; you

24  have to put it on the side.  Once it's on the side, it will

25  slide up and down.  And the carabiner goes over -- I don't know

N4HVJIAC

1    if you can see this, your Honor.  It goes over the belt, not

2    any partition element.  And that forms the hanging mechanism

3    for the objects that you're going to hang from it.

4                THE COURT:  So let the record reflect that counsel for

5    Hyponix is illustrating with Court Exhibit 1 the connection

6    that appears to be reflected in Exhibit 2 on the right-hand

7    side of the page.  Is that correct, Mr. Isackson?

8                MR. ISACKSON:  It is, your Honor.  It's also in

9    Exhibit 3, also on the right-hand side of the page.

10               THE COURT:  Thank you.

11               MR. ISACKSON:  That's correct, your Honor.

12               So, in summary, there's no integral piece.  There's no

13   pair of vertical members connected to two ends of a partition

14   element; there's no first connection area; there's no second

15   connection area; there's no areas such as those defined by a

16   partition dividing a mouthpiece; there's no strap.  Element 4

17   colored in pink, it's not even there.  It's totally gone.

18   There's no strap having one end threaded through one open area,

19   through the other open area over the partition and then secured

20   together.

21               And I'll also refer the Court to the video screenshots

22   that we included at docket 15 of page 3, and the link that was

23   disclosed in docket 15, as well as in Mr. Rai's declaration,

24   docket 28 at paragraph 10, which shows an animation of how this

25   is assembled and how the product is used.

N4HVJIAC

1              So as the video and the center top image of my

2     demonstratives here show and as I've demonstrated, the M-shaped

3     structure slides onto the strap not by a threading of the strap

4     through an open end or an opening in it, the carabiner clips

5     around the belt, element 1, figure 2 of the patent, in the

6     middle of the M, and it just doesn't have what's called for in

7     the claims.

8              So to expand on plaintiff's briefing of the legal

9     issue of infringement, which was accurate as far as it went,

10    I'd like to add a few points.

11             Literal infringement requires that every limitation

12    set forth in a properly interpreted claim must be found in an

13    accused product or process.  *Warner-Jenkinson Company v. Hilton*

14    *Davis Chemical*, 520 U.S. 17, pincite 40 (1997).  The absence in

15    an accused product of a single element specified in a patent

16    claim is sufficient to negate infringement.

17             Here we have five missing elements:

18             Rectangular-shaped buckle; a rectangular-shaped buckle

19    that has one integral piece; a pair of horizontal members and a

20    pair of vertical members; a partition connected at its ends to

21    the vertical members, dividing the buckle into two connection

22    areas; and a strap having one end passing through one

23    connection area over the partition, through the other

24    connection area, and then connected to the other end of the

25    strap.

N4HVJIAC

1          If there's no infringement of an independent claim,

2     then any claim depending from that also cannot be infringed.

3     *Kim v. Conagra Foods*, 465 F.3d 1312, 1316 n.1 (Fed. Cir. 2006).

4          Thus, claims 2-8 of the '763 patent which depend from

5     claim 1, are also not infringed for the same reasons that claim

6     1 is not infringed.

7          Claim elements that are not literally met may be

8     infringed under something called a doctrine of equivalence if

9     the differences between the claim features and corresponding

10    features of the accused products are not insubstantial.

11    *Warner-Jenkinson*, 520 U.S. at 21; and *Hilton Davis Chemical v.*

12    *Warner-Jenkinson*, 62 F.3d 1512, jump cite 1517-18 (Fed. Cir.

13    1995).

14          As it was said, the question which thus emerges is

15    whether the substitution of one element for the other is a

16    change of substance as to make the doctrine of equivalence

17    inapplicable or, conversely, whether under the circumstances

18    the change was so insubstantial that the trial court's

19    invocation of the doctrine of equivalence was justified, citing

20    *Graver Tank & Mfg. Co. v. Linde Air Products*, 1339 U.S. 605,

21    610 (1950).

22          The doctrine of equivalence is applied to each

23    individual claim element though; it's not applied to the claim

24    as a whole, so it cannot be used to eliminate an element from a

25    claim in its entirety.  *Warner-Jenkinson*, 520 U.S. at 29.

N4HVJIAC

1          There are two common articulations of the tests for

2     the doctrine of equivalence:  The function-way-result test and

3     the insubstantial differences test.  *Voda v. Cordis Corp.*, 536

4     F.3d 1311, 1326 (Fed. Cir. 2008).

5          In the function-way-result test, an element that is

6     alleged to be an equivalent to an element of a patent claim is

7     examined to determine if it performs substantially the same

8     function, in the same way, to obtain substantially the same

9     overall result.  If the element does so, it's considered to be

10    an equivalent; if it doesn't, it's not.

11         Under the insubstantial differences test, an

12    equivalent results from an insubstantial change which adds

13    nothing of significance to the structure, material, or acts

14    disclosed in the relevant patent.  Citing *Tomita Technologies*

15    *USA v. Nintendo*, 681 F. App'x 967, 972 (Fed. Cir. 2017) (citing

16    *Valmont Industries v. Reinke Manufacturing Company*, 983 F.2d

17    1039, 1043 (Fed. Cir. 1993).

18         Under this law, there is no infringement under the

19    doctrine of equivalence.  There are substantial differences

20    between the rectangular-shaped buckle, one integral piece

21    required by the claims, and what Hyponix is selling.  And the

22    doctrine of equivalence cannot be used to eliminate an element

23    required by the claim.  There is no rectangular-shaped buckle

24    and nothing insubstantially different.

25         Hyponix's two-piece carabiner and M-shaped bracket

N4HVJIAC

1   system have a different function.  They work a different way

2   and they achieve a different overall result.  This can be seen

3   from Court Exhibit 2, which has a comparison of what happens

4   with a buckle, as shown on the left, as compared to plaintiff's

5   system, which is shown on the right.  It achieves a different

6   result.

7           Also, there is no partition joined at its ends to the

8   pair of vertical elements.  The partition requires threading

9   through the open connection areas, where the Hyponix operates

10   quite differently.  It has no open area connection areas, you

11   don't thread a strap through it, you slide it onto the edge of

12   the strap.  No threading is needed.

13           Further, there's no one integral piece of the

14   rectangular-shaped buckle with its constituent parts.  I think

15   I mentioned that.  Sorry.  There also is no strap threaded

16   through the first and second connection areas.

17           In this regard — and this goes back to the connection

18   member limitation in the preamble I mentioned earlier — the

19   '673 patent discloses the difference between a connection

20   member, which it states can be a carabiner, column 3, lines 29

21   through 34 of the specification, such that an obstacle can be

22   hung from a carabiner, which, in turn, is hung from the strap.

23   This establishes that a carabiner performs a different function

24   than the hanging strap 4 that's threaded through the open

25   connection areas 6, 7, and 8, over the partition that's

N4HVJIAC

1    required by claim 1.

2              We submit that on the undisputed facts here — and

3    there's nothing plaintiffs can submit that will change these

4    facts, your Honor — there's no infringement of claim 1 or any

5    claim depending therefrom literally or by application of the

6    doctrine of equivalence.  We also submit that there's no set of

7    facts that could set forth a facially plausible claim of

8    infringement by Hyponix.

9              For this reason, we believe plaintiffs fail to carry

10   their burden of proof of likelihood of success on the merits to

11   support a temporary restraining order or a preliminary

12   injunction against Hyponix.  They are not entitled to any

13   extension of a temporary restraining order/preliminary

14   injunction; and that the TRO never should have been granted in

15   the first place.

16             And at this point, your Honor, I will just do two

17   things:

18             One, acknowledge that my client was informed last

19   night around 7 o'clock, I believe Pacific time, that his Amazon

20   account was actually reinstated.

21             And two, I believe that the foregoing submission on

22   the record establishes that Hyponix's grounds under Rule

23   12(b)(6) and under Rule 56 to respectively dismiss the case

24   and/or grant it summary judgment for no infringement.

25             And with respect to the reasons for sanctions and

N4HVJIAC

1    attorney fees under exceptional case Section 285 of the patent

2    act, my understanding is the Court would prefer to have that

3    drafted and submitted in writing.

4              THE COURT:  Yes.  But let me ask a few questions.

5              Are you done, Mr. Isackson?

6              MR. ISACKSON:  I am.

7              THE COURT:  Okay.  Thank you.

8              I think it's for plaintiff first.

9              Plaintiff's counsel, whoever is going to respond to

10   it, what's your position with respect to your action against

11   Hyponix?

12             MR. FAIRCHILD:  Your Honor, Mr. Liu submitted a

13   declaration today that Hyponix was selling other buckles as

14   well; that it wasn't just this, but the standard rectangular

15   one that we see with all the other ones, that -- with his

16   investigation and reassertion that Hyponix was still selling

17   that, at least until after -- certainly after the patent

18   issued.  So they are -- there is an infringement claim with

19   that design, your Honor.

20             THE COURT:  Let me ask about that.  I'm looking at the

21   item that was filed at ECF No. 30.

22             First of all, it says it's information provided by the

23   defendant D59.  D59 is, on the chart here, Caspian.  Can you

24   clarify -- this is paragraph 2 of Mr. Liu's declaration.

25             MR. FAIRCHILD:  Yes, that was a typographical error;

N4HVJIAC

1   it should be 63.

2           THE COURT:  Okay.

3           Then secondly, it talks about Monkey Line.  What is

4   the relationship between Monkey Line and Hyponix?

5           MR. ZHANG:  Your Honor, based on the information and

6   based on the business record, the Hyponix also operate as a

7   business under the name of Monkey Line.  So based on

8   information we have received from the defendant's counsel, my

9   client realized that the Hyponix is actually the Monkey Line

10  used to contact with my client.

11          THE COURT:  Mr. Isackson, is Monkey Line equivalent to

12  Hyponix?

13          MR. ISACKSON:  My understanding, your Honor, is that

14  Monkey Line is the name of a product, it's not the name of a

15  company.  The company brand is Outdoor something.  I don't have

16  a copy of that declaration printed.  It was filed after I left

17  home, so I don't have it.  There is a brand name on the

18  document, I believe, Outdoor something, and that is a Hyponix

19  brand.

20          And my understanding also is that the picture that was

21  submitted is an obsolete product that hasn't been sold since

22  November of 2022, shortly after Hyponix received notice of the

23  patent.  And I would submit that if there is any infringement,

24  it's *de minimis*.  And I have not looked at that product, I

25  don't know anything about it, so I can't speak to it, your

N4HVJIAC

1    Honor.

2              THE COURT:  Thank you.

3              I'm just a little bit troubled.  I'm speaking now to

4    plaintiff's counsel.

5              This was not submitted initially with your complaint.

6    It's got the typographical error in it.  I am leery of the

7    representations that are made, given some of the other

8    representations that I'm going to talk about here today which

9    don't appear to be consistent with what I have heard from

10   plaintiff.  And it seems to me it's not part of the complaint

11   that's been filed.  And I'm hearing representations from

12   defendant's counsel that it has not been sold since November

13   2022.

14             Do you have information to refute that, Mr. Fairchild?

15             I'm sorry, Mr. Isackson, you want to clarify

16   something?  I said something incorrect.

17             MR. ISACKSON:  I do, your Honor.

18             I understand that the image was a recent image; but

19   the product represented in that image has not been available.

20   I just wanted to make that clarification.

21             THE COURT:  The product is what?

22             MR. ISACKSON:  The product has not been available.

23   That actual product on that image has not been available since

24   November '22.  The product that was actually sold since then is

25   the one before you in Court Exhibit 1.

N4HVJIAC

1          THE COURT:  Thank you.

2          MR. ISACKSON:  And so the picture is obsolete; it had

3    never been taken down.  I don't think anybody knew it was still

4    up.

5          THE COURT:  Thank you.

6          Mr. Fairchild, do you have anything to substantiate

7    your claim that it is currently being sold?

8          MR. FAIRCHILD:  I'm looking at a printout from Amazon.

9    It says it's a Monkey Line model; date first available, March

10   21, 2023.

11         THE COURT:  All right.  I'm going to have to give

12   Mr. Isackson an opportunity to actually look at that document.

13   But, in any event, this has not -- it is not part of your

14   complaint; is that correct, Mr. Fairchild?

15         MR. FAIRCHILD:  I don't think -- we did not put Monkey

16   Line as one of the Joes, your Honor, yes.

17         THE COURT:  Thank you.

18         Mr. Isackson.

19         MR. ISACKSON:  Yes, your Honor.

20         I've been handed a copy of document 29-1.  And the

21   image there is the one that I've been advised by my client is

22   an obsolete image of a product that has not actually sold.  The

23   product referenced, the Monkey Line or whatever this is shown

24   in this exhibit here, is available for sale, but with the

25   current configuration corresponding to Court Exhibit 1, not the

N4HVJIAC

1    one that's actually indicated in the picture.  The picture is a

2    legacy picture that's inaccurate and will be taken down

3    shortly.

4                THE COURT:  Thank you.

5                So that product is not being sold.  And I presume that

6    plaintiffs did not attempt to buy the product; is that correct,

7    Mr. Fairchild or Mr. Zhang?

8                MR. ZHANG:  Yes.  Actually we just noticed this.  We

9    just noticed this list change like this morning.  So, yeah, as

10   defendant –– as the defendant is dismiss from this –– from this

11   matter, so we are not going to buy.

12               THE COURT:  Okay.  So that's kind of where I wanted to

13   get you to.  I allowed Mr. Isackson to make his presentation,

14   both because it was very informative, it's also important;

15   other defendants can see it as well.  But I really want to

16   know, what is your intention with respect to Hyponix as a

17   defendant?  Are you withdrawing –– are you voluntarily

18   dismissing him?  Are you withdrawing your request for a

19   preliminary injunction against him?

20               MR. ZHANG:  Yeah.  Actually, we have dismissed the

21   defendants and we have instruct Amazon to release their account

22   and to reinstated the listings.  So we have dismissed the

23   defendant from the –– from the TRO or from a future PI and from

24   this matter.

25               THE COURT:  And you're no longer seeking a TRO or a

N4HVJIAC

1   preliminary injunction against Hyponix?

2           MR. ZHANG:  No, not in this case.  But according to my

3   client, we may seek a separate action against this defendant,

4   separate case, but not in this case.

5           THE COURT:  Mr. Isackson.

6           MR. ISACKSON:  I'm sorry.  Could Mr. Zhang repeat the

7   last part; I didn't quite catch that.

8           MR. ZHANG:  Yeah.

9           Based on the communication between me and my client,

10  we may seek a separate action against your client, but not in

11  this case.  So we have already dismissed withdraw or against

12  client this matter.  And we instruct Amazon to release your

13  client's accounts and reinstate the ASIN, the Amazon listing.

14          THE COURT:  Mr. Isackson.

15          MR. ISACKSON:  Your Honor, I guess I'm confused.  They

16  want us out of this case, but they want to file a new case.

17          We're here.  The issue has been joined.  I don't know

18  why we need to go further with a new lawsuit, your Honor.

19          THE COURT:  Well, I can imagine -- so procedurally

20  this is unusual, to say the least.  Generally, when someone is

21  released from a lawsuit, they are glad and they leave.  But I

22  understand why you're here, because obviously you don't want to

23  be re-litigating this again in another action.

24          So what I will do is you'll be released from this

25  case, because if they voluntarily dismissed you, I'm not sure

N4HVJIAC

1   there's anything I can do about that.  However, I would imagine

2   that you're going to be filing whatever papers you think are

3   appropriate to file here in terms of your request for

4   attorneys' fees with respect to whether there is a basis to

5   dismiss your case with prejudice as opposed to without

6   prejudice.  And I need to see the authorities on that before I

7   can make a ruling on that.  So if you would submit those

8   papers.

9          When would be an appropriate time, Mr. Isackson?

10          MR. ISACKSON:  Your Honor, if we're dismissed from

11   this case, can we have two weeks?

12          THE COURT:  Sure.  Sure.  Yes.

13          And you may be moving for some sort of relief against

14   the bond.  I don't know what your intentions are there.

15          MR. ISACKSON:  Was a bond posted, your Honor?

16   Respectfully, we haven't seen any of the court papers.

17          THE COURT:  You will see them as they are unsealed

18   today, and a bond was posted.

19          MR. ISACKSON:  Was it $500, your Honor?

20          THE COURT:  No, it was not; it was a significant bond.

21          MR. ISACKSON:  Thank you, your Honor.

22          THE COURT:  Okay.  But you'll see it today.

23          So there may be other relief that you're seeking, but

24   I will -- I'll see that from you in two weeks.  And obviously

25   there will be no TRO or preliminary injunction with respect to

N4HVJIAC

1      your client.

2                   MR. ISACKSON:  Thank you, your Honor.

3                   Your Honor, can we ask that the Court -- I don't know

4      if we have jurisdiction or standing, but would the Court

5      entertain ordering plaintiffs to send notice to each entity to

6      whom they sent the TRO, clarifying that it was sent against

7      Hyponix in error and it should be disregarded as if it was

8      never issued?

9                   THE COURT:  I question whether there's still

10     jurisdiction to do that.  And then secondly, the relief you're

11     asking for I think is a little unusual.  But stay tuned and

12     stay here and we'll continue there.

13                  MR. ISACKSON:  Thank you, your Honor.

14                  THE COURT:  Okay.

15                  All right.  Mr. Fairchild or Mr. Zhang, anything else

16     with respect to Hyponix?  You'll be permitted obviously to

17     respond to whatever they submit in two weeks.

18                  MR. FAIRCHILD:  I just want to make a note, your

19     Honor, that when we first heard from Hyponix, they gave us a

20     deadline to respond to them by Friday, close of business on

21     April 14th.  I just want to make it known that I believe we

22     filed the motion to voluntarily dismiss far earlier in the day,

23     I think around 11 a.m. that morning.

24                  THE COURT:  Well, you're going to be responding to

25     whatever Mr. Isackson submits in terms of his view about his

N4HVJIAC

1    entitlement to whatever relief he can get in light of your

2    voluntary dismissal, and I presume that you'll respond to that.

3            Okay.  Let me move -- well, let me ask a question,

4    since I have you in front of me.  Mr. Isackson, was there a

5    relationship between your client and plaintiff in terms of

6    purchasing from plaintiff products produced by plaintiff?  Am I

7    getting that from this declaration?

8            MR. ISACKSON:  That's the way I understood it, your

9    Honor.  I don't know.  Frankly, I didn't see this until I was

10   reading it on my phone about an hour before court today, and I

11   didn't have a chance to discuss it with my client.

12           THE COURT:  Okay.  We're all learning in real-time.

13           Okay.  Thank you very much.

14           All right.  I think that was one of the more

15   substantive ones that I had here.

16           I'm also going to hear from the other two defendants.

17   Before I do -- actually, I'll hear from Ms. Hudak.

18           Do you have anything you'd like to add?  I know you're

19   here, it's pretty late notice, you just appeared today; but I'm

20   happy to hear if there's anything that you'd like to present to

21   the Court.

22           MS. HUDAK:  Yes.  Thank you, your Honor.

23           I do not have a detailed presentation like

24   Mr. Isackson, as I just learned of this action today; the

25   client just learned of this action today.  But I would like to

N4HVJIAC

1    just argue that the TRO should not be continued and a

2    preliminary injunction should not be entered for a number of

3    reasons.

4         One very important reason is that venue is not

5    appropriate on behalf of my client, Sell Below Cost.  Patent

6    law has a specific venue statute, 28 U.S.C. 1400, which

7    requires a defendant accused of patent infringement be sued

8    where the defendant resides or has committed actions of

9    infringement and has a regular and established place of

10   business.

11        My client, Sell Below Cost, is a California LLC that

12   does business in New Jersey; and so venue is not appropriate in

13   this district.  And it was misjoined with all of these other

14   defendants.  I believe that misjoinder is improper as to many

15   of the defendants.  Joinder would only be appropriate if the

16   cause of action was arising out of the same transaction

17   occurrence or series of transactions or occurrences under

18   Federal Rule of Civil Procedure 20(a).  And here, I mean, the

19   defendants have different products, have no relationship as far

20   as I know or at least my client does not have a relationship as

21   far as it knows to any of the other defendants.  And so it

22   should be severed from this action against all of these other

23   defendants; and it should be dismissed from the case, as venue

24   is not appropriate.

25        As far as the other preliminary injunction factors,

N4HVJIAC

1   Mr. Isackson already gave a long argument about why plaintiff

2   has not established irreparable harm; and that is one of the

3   most important factors in granting preliminary injunction.

4         Also, as Mr. Isackson argued, the balance of the

5   hardships does not favor a preliminary injunction here.  Very

6   often, in patent cases, the remedy would be a reasonable

7   royalty or some other type of monetary damages.  And here, to

8   have my client's listing take down for the duration of the

9   lawsuit -- also as of right now its funds are frozen in Amazon

10   and it cannot access funds from its Amazon selling account, and

11   so it's suffering a great deal of hardship with the TRO in

12   effect.

13         And then as to the likelihood of success on the

14   merits, as Mr. Isackson's presentation pointed out, patent

15   infringement can be a very complicated analysis.  Claim

16   construction is a very important part of deciding whether there

17   is patent infringement or not and whether the patent is valid

18   or not.  And as Mr. Isackson pointed out, there's an extensive

19   prosecution history here where the amendments made to the

20   claims need to be taken into account in construing any of the

21   claim language.  And I believe that strong invalidity arguments

22   can also be made.

23         As Mr. Isackson walked you through the claims, they

24   are covering a pretty basic product.  It's a flat strap with a

25   buckle on it that you hang things from.  And that concept has

N4HVJIAC

1   been around for a very long time.  And I believe that many

2   invalidity arguments can be made if given a sufficient amount

3   of time.  And so if your Honor is inclined to grant either a

4   continuance of the TRO or a preliminary injunction, I would ask

5   that we be given an opportunity to respond in writing as to

6   some of these arguments.

7          THE COURT:  Thank you.

8          And I assume, Mr. Rosenbaum, I saw also in your papers

9   that you talked about some invalidity arguments as well.

10          MR. ROSENBAUM:  Significant invalidity arguments.

11          And I hope that my adversaries won't change their

12   mind, but prior to walking into the courtroom, my team had

13   worked out an arrangement with plaintiff's counsel where we

14   would be released from it, except as to future sales of

15   allegedly infringing products, which we dispute.

16          What the Court was wrongfully persuaded to do was to

17   freeze all of the defendants' entire businesses:  The assets,

18   usually in terms of inventory; the sales of products; the money

19   spent on ads at Amazon, all frozen.  And actually, several

20   steps back, Mr. Isackson discussed, where Amazon not only has

21   algorithms as to what the buyers see, but how Amazon treats the

22   sellers and all of their products.  These orders that are being

23   issued specifically from the Northern District of Illinois, by

24   this courthouse, by the Southern District of Florida, fails to

25   take into account that this sales of allegedly infringing

N4HVJIAC

1    products are often a minute portion of the business's sales

2    overall.

3              So in terms of my clients, No. 42 and No. 67, we're

4    going to ask the Court to take the step to issue us the

5    two-line order directing Amazon, as well as the other platforms

6    — which was not accidentally served to them; this is a strategy

7    that's used all over the United States.  They serve the orders

8    on platforms that are not involved, to get the platforms to

9    stop the sales, because all they want to do is avoid potential

10   liability.

11             So we're going to ask the Court — and I believe it

12   should be a joint application — to issue an order that

13   regarding No. 67, Trailblazer, and No. 42, Ninja, that they are

14   specifically released from any restraint, except as to the

15   specific allegedly infringing products, if your Honor doesn't

16   dismiss the case out of hand.

17             And in addition to what Mr. Isackson described and

18   Ms. Hudak described, the service of process, that whatever your

19   Honor issued in these sealed documents, was not effectuated.

20   Our clients never received any notice except from Amazon.  And

21   I would bet dollars against doughnuts that none of the

22   defendants received anything, except when Amazon let them know,

23   Your entire business is now frozen because of a court order

24   issued by a courthouse.  We don't find out the case number, we

25   have to go digging.  The sealing is tremendously problematic

N4HVJIAC

1   for Amazon sellers all over the country.

2          In many of these cases, you see these vast terms.  In

3   this particular case, there's no allegations against specific

4   sellers.  There's no jurisdiction in the Southern District of

5   New York, because there's no evidence of sales in New York.

6   Unlike the Northern District of Illinois, offering sales of

7   products in Illinois, that courthouse has chosen to hold

8   sellers under its fire.  Here in the Southern District, that's

9   not the case.  I wish I had the citations for your Honor.

10  There's been many cases here that without an actual delivery of

11  a product, there's no jurisdiction here.  There's no

12  jurisdiction.  There's no service of process.  The claims are

13  out of whole cloth.

14          I'd ask the Court, even though we have a deal in place

15  for my particular clients, that on behalf of all the sellers in

16  this litigation, that your Honor dismisses the case out of

17  hand.  And if it chooses not to do that, to then limit the

18  claims solely from October 25th forward.  And that's what I

19  believe the Court should do.

20          And I hope my adversaries don't back out of the

21  arrangement that we have with the Court.  If you choose not to

22  dismiss the case today in its entirety, please issue a two-line

23  order, because that's what works with Amazon.  Relying upon

24  opposing counsel does not always get the goal done of getting

25  our clients back into business.

N4HVJIAC

1          THE COURT:  So let me ask a few questions,

2     Mr. Rosenbaum.

3          The restraining order with respect to the assets was

4     limited to the accounts insofar as they pertain to the sale of

5     infringing products only.  You're saying that Amazon freezes

6     more expansively than that?

7          MR. ROSENBAUM:  Just about every time, your Honor.

8     For every single seller, from every order that comes out of

9     this courthouse, the Western District of Pennsylvania, the

10    Northern District of Illinois, the Southern District of

11    Florida, Amazon, in particular, freezes everything:  Inventory,

12    sales, and money.

13         THE COURT:  Well, that's very interesting to know.

14    Because I specifically tried to limit the order to apply only

15    to the infringing products, understanding that companies may

16    sell more than simply the purportedly infringing products.  But

17    it's been your experience that they close the entire site and

18    account?

19         MR. ROSENBAUM:  Yes, your Honor.  Hundreds, if not

20    thousands of sellers that I've interacted with myself, that's

21    what Amazon does.  And there's nothing that requires Amazon to

22    only follow the court order and only freeze certain assets.

23    There's nothing that says, You must only freeze this and let

24    them sell that.  Amazon, in particular, freezes everything.

25    It's a method that Amazon uses to avoid any potential

N4HVJIAC

1    liability.  If there are damages, Amazon wants to make sure

2    it's holding enough of other people's money.

3         So the orders that are issued in this courthouse, the

4    Northern District of Illinois, and the other venues I've

5    discussed, causes these businesses to be shut down.  And,

6    worse, the investments that these businesses have made to

7    increase their ranking in Amazon's eyes — which is also based

8    upon secret algorithms — their inventory, all of that gets

9    destroyed.

10        THE COURT:  And, Mr. Isackson, you were standing to

11   say something?

12        MR. ISACKSON:  Yes, your Honor.

13        I understand that Hyponix has approximately 30

14   products that are sold on Amazon.  While only the one ASIN was

15   taken down, its entire account, managing the cash flow for all

16   those products was frozen.  My understanding is that Amazon

17   considers it related, as the court order said.  Because all the

18   cash flows through one account.

19        THE COURT:  You're supporting what's been represented

20   by Mr. Rosenbaum.

21        MR. ISACKSON:  That's correct, your Honor.

22        MR. ROSENBAUM:  I'd also add, all the ad spends that

23   are done, Amazon is split up into different arms and different

24   aspects of it.  All the ad spends that my clients did and

25   Ms. Hudak's client and Mr. Isackson's clients, that has all

N4HVJIAC

1    been denigrated because of them being subjected to a court

2    order.  And it makes sense for Amazon.  Why do business with

3    anyone who's having issues in court, when the money will

4    continue to flow through Amazon and it would just be sold by

5    different sellers or Amazon itself.  These orders are

6    tremendously problematic and harmful to businesses all over the

7    world, your Honor.

8            THE COURT:  Thank you, Mr. Rosenbaum.

9            Ms. Hudak, you wanted to add something?

10            MS. HUDAK:  I just wanted to add on to what

11    Mr. Rosenbaum said about making a deal with plaintiffs.

12            My client also discussed with plaintiff today about

13    notifying this Court and instructing Amazon to release my

14    client's funds.  They want to keep the listing frozen, but they

15    said that they would ask you to modify the order to release my

16    client's funds.

17            THE COURT:  Okay.  So let's understand then where we

18    are right now with these particular defendants.

19            Mr. Zhang or Mr. Fairchild, who's ever going to speak

20    to it, I now understand what's happening with Hyponix; they are

21    voluntarily dismissed and Hyponix is going to make an

22    application for whatever relief it deems appropriate here.

23            What about Sell Below Cost or Mr. Rosenbaum's clients?

24            MR. ZHANG:  Your Honor, as last time I disclosed that,

25    and the Amazon, sometimes they may withhold the money that's

N4HVJIAC

1    more than the accused products being sold.  And upon learning

2    of the defendants' luck there, because Amazon provided me with

3    an Excel of the total numbers of the products been sold and the

4    amounts have been restrained and the accused products been sold

5    for generate amount.  So once the defendants reached us, we

6    first have to see how much products, accused products being

7    sold.  And that then we just do a calculation and release the

8    balance.

9            For example, the defendants No. D059, when it has been

10   restrained, it has over $2 million.  But for this defendant, he

11   only sold like around like 300 products.  So we recently

12   negotiate, we reach a settlement agreement with the defendant's

13   counsel.  And we just restrained like only $30,000 and release

14   the balance -- and release the balance.

15           And also, as well as with the other two counsels and

16   with two other counsels here today, and we also agree to

17   release the account assets being restrained by Amazon.  And

18   also, I have another listing, like, in my hand; and we are

19   going to ask this Court to release the account assets because

20   of the significant amounts being restrained.

21           THE COURT:  Okay.  I hear you.

22           But I want to know right now what you're going to do

23   with respect to Sell Below Cost.  Are they still in this case

24   or are you dismissing them from this case?

25           MR. ZHANG:  No, just release their account assets.

N4HVJIAC

1          THE COURT:  Okay.  What about Mr. Rosenbaum's client,

2     are they released from this case?

3          MR. ZHANG:  No, not dismissed from this case, but just

4     to release their account assets.

5          THE COURT:  Okay.  Well, I'm going to take care of

6     that myself, so -- in terms of the TRO is going to expire

7     tomorrow; all the assets are going to be available to everyone.

8          So we'll go through that.

9          Mr. Rosenbaum, what do you have to say?

10          MR. ROSENBAUM:  Your Honor, what the Court just heard

11     is exactly what the problem is.  These plaintiffs froze over $2

12     million of some business's money that they could have used for

13     inventory, make payroll, invest in ads, grow their business.

14     And it allowed them -- I'm not saying these lawyers did that,

15     but it allowed them the opportunity to extort $30,000 in order

16     to free the two million.  And I bet dollars against doughnuts

17     again that the bond is nowhere near a $2 million bond that the

18     business could have suffered.

19          So by freezing everything, by issuing these orders,

20     and by plaintiffs such as these bringing these cases, with the

21     full knowledge that their sales of the infringing products are

22     a small portion of the overall sales, it allows them to get

23     involved in legal extortion.  We will agree to unfreeze your

24     two million if you pay us $30,000.

25          I'd ask the Court to dismiss the entire case based

N4HVJIAC

1    upon the plethora of problems that have been described, in

2    addition to the lack of jurisdiction under the patent act and

3    the lack of service.  I know they didn't serve it, so I know

4    your Honor ordered some type of service, and none of our

5    clients received it.

6            THE COURT:  Okay.  I have a couple of questions for

7    plaintiff's counsel.  No, I don't.  I have for -- okay.  No.

8            All right.  So what I'm going to do now is I'm going

9    to make some rulings so that we know where we're going in this

10    case, and then we're going to talk about next steps.

11            Before I do, I'll ask Mr. Fairchild or Mr. Zhang, is

12    there anything that you want to add to the arguments that have

13    been presented by defendants regarding letting the TRO expire

14    by its terms and not imposing a preliminary injunction today?

15    I don't even know that you were seeking a preliminary

16    injunction today.  Actually, you were seeking an extension of

17    the time in which to seek one.  But is there anything you would

18    like to add to your papers?

19            Mr. Zhang?  Mr. Fairchild?

20            MR. FAIRCHILD:  I have nothing, your Honor.

21            THE COURT:  Nothing.

22            MR. ZHANG:  I just want to -- I just want to like --

23    to remind -- I just want to like remind the defendants'

24    counsel, the $30,000 is not -- is not a settlement amount; it's

25    just because based on the products of the around like 300 --

N4HVJIAC

1   300 per units that's been sold, and its product sold around

2   like $100.  So that is amount based on the mutual consent with

3   the defendants' counsel and me.

4          And also, this case, we finally, like -- we were to

5   settle -- we already settled this matter for the defendant No.

6   D059.  And the amount is based on their profit, the profit

7   after our client's patent registration is granted.  So we are

8   not using these as some -- as a manner to unfair compete the

9   defendants or like is to use to this manner like to abuse this

10  court procedure, like to get the -- to get at unfair profit.

11          THE COURT:  Thank you.

12          Mr. Fairchild, are you the one that was going to

13  respond to questions about patent?

14          MR. FAIRCHILD:  Yes, your Honor.

15          THE COURT:  Okay.  So my question is, how is it that

16  an item like what's been reflected in Hyponix's presentation

17  that doesn't even have a rectangular-shaped buckle or a flat

18  strap, how is it that that would have been infringing of the

19  patent?

20          MR. FAIRCHILD:  I think it does have a flat strap.

21  You mean the flat strap that goes over the buckle?  Is that --

22          THE COURT:  No.  The patent defines a flat strap as it

23  passes through the connection area.  And it -- it essentially

24  holds the carabiner.

25          MR. FAIRCHILD:  Right.  Okay.

N4HVJIAC

1          Your Honor, when I looked at the website, I've seen

2     this picture before.  And the version of the picture I was

3     looking at, I didn't have the actual things with me, I thought

4     it was a all one piece.  And it looked like to me that the flat

5     strap could go over it.  I couldn't tell that it was dangling

6     as it was.

7          THE COURT:  Okay.  So you don't dispute that it's not

8     infringing as you see it now?

9          MR. FAIRCHILD:  Certainly not a literal infringement,

10    your Honor; but we don't dispute that.

11         THE COURT:  Okay.  Thank you.

12         And then I'm seeing -- just want to ask a question.

13    So, for example, for -- and I'm just going to pick a random

14    one.  Here's one.  No. 85, Joybuy.  Do you have that in front

15    of you?

16         MR. FAIRCHILD:  I do not.

17         THE COURT:  Okay.  It's sort of a triangular shape.

18         MR. FAIRCHILD:  Where the triangle dangles with the

19    carabiner attached to it?

20         THE COURT:  Correct.

21         MR. FAIRCHILD:  Yes, I believe that would infringe.

22         THE COURT:  I want to understand why, since the patent

23    itself states that you need to have — one moment — a buckle

24    flat strap, which is No. 4 in the embodiments.  And I know that

25    the claim is not limited to the embodiments, but I want to

N4HVJIAC

1    understand what's your position about how that infringes based

2    on the claim requiring a buckle flat strap.

3           MR. FAIRCHILD:  My understanding is it is a buckle.

4    Even though it has the triangle on the bottom, it still is a

5    buckle.  I'm sorry, I don't have the picture in front of me.  I

6    looked at a lot of those; and it looked like there was a

7    buckle, despite having the triangle below.

8           THE COURT:  I'm not talking about the triangle that's

9    a connector.  I'm talking about it has -- it says -- the chart

10   says that it has to have a mounting member that it's a, quote,

11   flat strap to receive the rectangular-strapped buckle -- shaped

12   buckle.  It has to have a strap.

13          So I'm going to hold up the patent right now.  I know

14   it's, again, only one of the embodiments.  Do you have the

15   patent in front of you?

16          MR. FAIRCHILD:  We have the patent, yes.

17          THE COURT:  Okay.  For example, in figure 4 and figure

18   5, you see No. 4, which is listed as the flat strap.

19          MR. FAIRCHILD:  My understanding is the flat strap can

20   go horizontal, your Honor.  I see what you're saying.  But,

21   like, this says -- and we use a flat strap, it can be

22   horizontal.

23          THE COURT:  If you look at figure 9, is not the

24   horizontal one -- are you talking about No. 1 on these figures?

25          MR. FAIRCHILD:  Yes, your Honor.

N4HVJIAC

1          THE COURT:  That's not the same as No. 4 on the

2    figures, is it?

3          MR. FAIRCHILD:  No, your Honor.

4          THE COURT:  Okay.  All right.

5          Well, I have enough of what I need.

6          All right.  I am going to rule as follows:  A TRO is

7    not to be extended unless, quote, good cause is shown.  And

8    that's under Federal Rule of Civil Procedure 65(b)(2).  I will

9    not be extending the TRO, so it will expire tomorrow by its

10   terms.

11         A TRO is an extraordinarily equitable remedy,

12   especially the *ex parte* TRO that was granted here.  And it was

13   granted without notice to the defendants based on plaintiff's

14   representations, many of which the Court is questioning now.

15         First, the submissions and presentation by Hyponix and

16   others has created serious doubt in this Court's mind as to

17   whether plaintiff and its counsel performed adequate

18   investigation as to whether the 163 defendants are selling

19   products that infringe upon the plaintiff's '673 patent.

20   Hyponix has pointed to at least four elements of claim 1 of the

21   '673 patent that are not present in its product.  Trailblaze

22   and Ninja Safe have also shown that their products may not

23   infringe claim 1 and have raised questions of invalidity, as

24   well as Sell Below Cost.

25         Secondly, in reviewing the information submitted by

N4HVJIAC

plaintiff with respect to the other defendants, and reviewing

just, let's say, first, the mounting members, which Hyponix has

helped to highlight, the following entries have mounting

members that are not rectangular-shaped buckles, as set forth

in claim 1 of the '673 patent:

No. 39, which is Kegitantan; 41, Zipdiz; 46, Lillian

Imports; 62, Trailblaze Products; 63, Hyponix Brands.

Other items do not seem to have the "flat strap" that

is used to, quote, receive the rectangular-shaped buckle, as

required by claim 1.  And for reference, figures 3 to 5 of the

patent show examples of these flat straps which we've just

discussed.

The Court has re-examined Plaintiff's Exhibit 4

attached to its complaint.  Exhibit D is a claim construction

chart regarding Defendant Jugader, for example.  That chart

says that plaintiff's invention must have a mounting member

that is a "flat strap to receive the rectangular-shaped

buckle."  However, Jugader's product does not have this flat

strap.

Plaintiff's Exhibit E at ECF No. 8-5; and G, at ECF

No. 8-7, has similar problems.  The following products also do

not seem to have a flat strap, aside from the sling body strap.

As already mentioned, No. 1, Jugader; No. 2, ACX; No. 3,

DRIPEX-US.  And we'll be sitting here for a while, because

there's 163 defendants, so let me just make my record.

N4HVJIAC

1          No. 4, HOPEMZ; No. 6, JOYMOR DIRECT; No. 8, NIOCC; No.

2     11, hooroorDirect; No. 13, Staruto; No. 14, Suncity Direct; No.

3     15, Falpro Direct; No. 16, MDSTOP; No. 19, Pao; No. 23,

4     Perantlb Wholesale and Retail Supply; 27, Fediman; 28,

5     Unbrella; 29, PKEPW; 30, eboee; 46, Sportneer Direct; 47,

6     NinjaSafe; 49, Thunderbay Products; 50, Belonet; 51, ZBPRESS;

7     53, Avican; 58, GOLDBRIX; 79, Aunuo Technology; 82, Shanghai

8     fanting; No. 83, Zeeyh; No. 84, Shenzhenshi; 86, Joybuy; 88,

9     Kaprolife; 90, Mehome Store; 92, GoDecor; 95, Funnytoys; 97,

10    Gouguhanshu; 98, Shen zhen shi de xing; 99, Fuhongda; 100,

11    Weihuize Store; 101, Imere Mallet; 102, ChuHeDianZi; 103,

12    JSHHH; 105, BT DIRECT; 109, FreshTop; 110, BestCollection; 111,

13    Yichaofan Store; 112, GoGames; 113, BAYTOCARE; 114, SalonMore;

14    115, HomeDirect; 116, SamyoHome, 119, Best Tech Discount; 127,

15    Joybuy Express; 128, Zimtown; 129, Breezy Goods; 133, UBesGoo,

16    134, Ktaxon; 135, Happy Girl Trading; 142, Windado; 143, Ktaxon

17    again; 144, UBesGoo; 146, Taizhou Senkang; 147, Taizhou Anerte;

18    153, Procircle Fitness; 158, Suzhou Nuoweisi; 168, Ningbo Yibo;

19    and 163, Shenzhen Lesterlighting.

20          Other evidence presented against other defendants

21    contained flawed pictures that do not even show the mounting

22    member clearly in order to evaluate potential infringement,

23    because pictures of the mounting member is either missing,

24    completely blurry, or does not contain a clear picture of a

25    rectangular-shaped bucket.  And those are for the following

N4HVJIAC

defendants:

No. 20, 21, 22, 24, 25, 26, 31, 32, 35, 36, 37, 54, 72, 75, 76, 77, 80, 81, 87, 96, 106, 120, 121, 123, 125, 126, 131, 136, 138, 145, 152, 169, and 161.

In addition, at least one example has a buckle that lacks a "partition element" that's described in claim 1, and that is 56, Edostory.

Because of these clear discrepancies and the showing by Hyponix and Trailblaze and NinjaSafe, the Court no longer accepts the allegedly representative samples of a claim chart presented by plaintiff in Exhibits C, D, E, F, and G of the five products that purportedly show that the 163 products sold by defendants are violating each element of claim 1 of the '673 patent.

According to plaintiff, "A patent claim is literally infringed if the accused product includes all elements or limitations of the claim." *Signtech v. Vutek*, 174 F.3d, 1352, (Fed. Cir. 1999); *Builders Concrete v. Bremerton Concrete*, 757 F.2d 255, (Fed. Cir. 1985).  And this was cited in plaintiff's brief at ECF 6 at 17.

Plaintiff asserts -- excuse me.

Given the examples that I have cited to above, based on the evidence provided to this Court thus far, plaintiff has not demonstrated a likelihood that he will be able to establish that every — or indeed many or any — of the 163 defendants'

N4HVJIAC

1    products include all elements or limitations of claim 1 of the

2    '673 patent.  Plaintiff has also not made any arguments

3    regarding the doctrine of equivalence.

4          In other words, using the standard the plaintiff set

5    forth in its memorandum of law in support of its motion for a

6    TRO and a PI, plaintiff has failed to show a likelihood of

7    success on the merits of its patent infringement claims.  It

8    may well be the case that plaintiff will be able to prove that

9    each defendant infringed plaintiff's product; but on the record

10   presented here, the Court finds that defendant is unlikely to

11   succeed on the merits on what has been presented thus far.

12         I will also note that there appears to be a claim of

13   patent invalidity, as I've mentioned before, that the Court

14   will have to closely evaluate.

15         The Court need not reach irreparable harm, since it

16   finds a lack of likelihood of success on the merits; but there

17   are also serious issues with plaintiff's assertion of

18   irreparable harm.

19         For example, plaintiff asserts it's being irreparably

20   harmed because it took great effort to ensure that its product

21   was safe and that it had appropriate insurance.  ECF 6 at 18.

22   But plaintiff has not presented any evidence that the products

23   being sold by the defendants are unsafe or create insurance

24   risk.  Plaintiff primarily claims that it has been financially

25   harmed by unauthorized counterfeiters with quantifiably annual

N4HVJIAC

losses.  That's at page 18 of the brief.  But such monetary

damages do not demonstrate irreparable harm.  *Oliver v. New*

*York State Police*, 812 F. App'x 61, 62 (2d Cir. 2020);

*Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir. 2002).

        While sales of infringing products could cause

irreparable harm in terms of harm to defendants' reputation and

market dilution, the Court is no longer persuaded that

plaintiff has established a likelihood of succeeding in

demonstrating infringement.

        As discussed during the TRO hearing, as well as today,

the Court is mindful of plaintiff's delay in seeking injunctive

relief.  Generally speaking, several months' delay in seeking

injunctive relief indicates plaintiff will not be irreparably

harmed by further delay in getting injunctive relief.  There

are several cases that support this Court's conclusion in that

assessment*:  Transscience*, 50 F. Supp. 3d, 457; *Kalipharma v.*

*Bristol-Myers,* 707 F. Supp. 741, 756; *Ethicon v. U.S. Surgical*

*Corp*., 762 F. Supp. 480, 505, and others.

        Plaintiff's counsel stated at the TRO hearing that the

plaintiff became aware of the infringement toward the end of

2022, and did not seek a TRO and PI until the end of March

2023.  When asked about the delay, plaintiff stated they were

investigating the over 200 alleged infringers to narrow down

the pool to the 163 present here.

        While the Court will accept that it took this long to

N4HVJIAC

investigate 163 infringers, the plaintiff could have brought

suit against the alleged infringers once they were discovered,

and chose instead to wait to bring a suit against 163

defendants at once, a strategy which could, as Ms. Hudak has

raised, raise questionable joinder issues.

The plaintiff has further not met its burden to

demonstrate that a continued asset freeze is warranted.  In

support of this request, plaintiff states that asset freeze is

unquestionably warranted because defendants were of unknown

location, are manufacturing, importing, exporting, advertising,

marketing, promoting, etc., products, and accepting payment for

such in U.S. dollars through financial institutions.

I now understand and hear from defendants that there

has been an over-freezing of the assets, notwithstanding the

limitations in the TRO that was issued.  But, in any event, any

asset freeze must be limited to an amount sufficient to

preserve the equitable claim and may not be used to preserve

funds that may later be used to satisfy an award of statutory

damages.  *Spin Master v. Aciper,* 2020 WL 6482878 at *3,

(S.D.N.Y. November 4th, 2020).

The Court finds that the arguments set forth in *Spin

Master* is very reminiscent of the one that is being made here.

In *Spin Master*, the court said:  A court may not enter a

preliminary injunction simply to safeguard a defendant's assets

in the event that defendant is ultimately held liable on these

N4HVJIAC

claims.  In *Spin Master*, the court held that plaintiff's

sweeping statements about the practices of foreign corporations

and counterfeiters in general are unsupported by evidence and,

more importantly, do not speak to the question of whether

defendant — a specific corporation whose liability for

counterfeiting is merely alleged, not established — is likely

to dissipate assets.

      Plaintiffs provides no legal authority for their

argument that the harsh remedy of an asset freeze would be

justified by the mere fact that a corporation is Chinese and

uses a cross-border payment processing service.  Implementing

plaintiff's theory would chill the huge volume of business

conducted by foreign corporations with customers and

corporations in the United States.  That's from the *Spin Master*

case.

      Here, plaintiff has not provided sufficient evidence

or legal authority in support of its contention that the 163

defendants are likely to dissipate assets, now that the Court

has more information.

      First, plaintiff's speculation in this regard because

the defendants are "of unknown location" is not persuasive.

Plaintiff has not demonstrated that it has even tried —

diligently or otherwise — to determine the location of the

defendants.  That is why the Court denied its motion for

alternative email service on March 31st, without prejudice for

N4HVJIAC

1    renewal if due diligence is shown for each and every defendant.

2    No such information has been provided to this Court.

3           In addition, as pointed out to the plaintiffs, a

4    simple search showed an address for several of the defendants:

5           Jugader has an address of 603 Lihuang Building, West

6    of Nanguolicheng Community in Shenzhen, China.

7           Klo Kick, who's defendant No. 138, has also an address

8    listed in Shenzhen, China.

9           Moreover, the Court is now concerned about the scope

10   of investigation that plaintiff has represented that they did.

11   Plaintiff represented that defendants' "e-commerce stores

12   indicate that the registrants are in China and other

13   neighboring countries."  ECF No. 5 at 4.

14          However, Hyponix has a Canadian address that the Court

15   was able to locate easily from their website.  Plaintiff's

16   declarant Mr. Liu also submitted a declaration today stating

17   that he knew that Hyponix was a Canadian company, which is very

18   troubling.

19          There are also others.

20          Happy Girl Trading, No. 135, is listed as having an

21   address in New Jersey, at 1100 Cranbury in New Jersey; Ninja

22   Safe has an address in Delaware, in the United States, listed

23   prominently on its website, and that is Defendant 131; and

24   Trailblaze is a UK company, as represented in their papers here

25   today.

1          Even if the location of the defendants was known, and

2     even if they were foreign entities, the threat that plaintiff

3     seeks to avoid that defendants will somehow dissipate their

4     assets to avoid enforcement of a judgment is speculative at

5     best.

6          Here, we have three defendants who have shown up here

7     that do not fit that mold; and, in any event, that is precisely

8     a basis that courts have held insufficient to justify an

9     attachment, especially the broad one that has been requested

10    here and is apparently being effectuated by Amazon.

11         Given the lack of diligence that plaintiffs have

12    seemingly done with respect to the defendants here, the Court

13    is no longer convinced that defendants are likely to destroy

14    products, records, or proceeds.  When determining whether to

15    grant expedited discovery, courts in this district apply a

16    flexible standard of reasonableness and good cause.

17         The Court finds that given the lack of diligence by

18    the plaintiffs, the failure to demonstrate likelihood of

19    success on the merits — at least at this preliminary stage —

20    and the lack of showing that the defendants will destroy

21    discovery, I do not find that there is good cause to continue

22    the order for expedited discovery, in addition to the asset

23    freeze.

24         The balance of hardships weighs in favor of the

25    defendants at this point, since their assets and their sites

N4HVJIAC

1    have been restrained when the other items that I've articulated

2    have not been established, at least preliminarily.  In

3    addition, the public interest no longer weighs in favor of an

4    injunction because the Court does not find that plaintiff has

5    demonstrated it is likely to succeed on the merits of

6    establishing patent infringement at this point.

7            Therefore, for all these reasons, plaintiff has not

8    shown good cause to extend the TRO beyond the 14 days

9    authorized by Federal Rule of Civil Procedure 65(b), and it

10   will expire tomorrow.

11           To make sure that Amazon and any other platforms are

12   informed, the Court will issue an issue tomorrow morning,

13   stating that the TRO expires on April 28th, and plaintiff is

14   hereby directed to serve that order on Amazon and any other

15   platforms to which plaintiffs served the original TRO.

16           Now, that was my original order, and I'm going to

17   stick with that.  But there may be additional things that I

18   need to order, given what's been represented by the defendants

19   here.

20           Let me ask Mr. Rosenbaum, if there is an order that's

21   sent to Amazon and the other platforms tomorrow that says that

22   there is no longer a TRO in effect, will that be sufficient to

23   ensure that the assets and the sites are no longer enjoined?

24           MR. ROSENBAUM:  It would be better if it was more

25   specific to the particular sellers, your Honor.

N4HVJIAC

1        THE COURT:  Oh, I will be attaching a list of all the

2    163 sellers.

3        MR. ROSENBAUM:  Then, yes, your Honor, I think that

4    would be sufficient.

5        THE COURT:  Okay.

6        MR. ROSENBAUM:  Mr. Isackson, do you agree?

7        MR. ISACKSON:  I do, your Honor.

8        I think it would also be important to identify the

9    ASIN numbers, Amazon's ASIN numbers, if they have that; because

10   that's how Amazon does its listings often.

11       MR. ROSENBAUM:  Your Honor, to be clear, you're going

12   to issue an order that all the assets that have been frozen are

13   now released.

14       THE COURT:  I'm going to be issuing an order that the

15   TRO that was signed on April 4th, 2013, is no longer in effect,

16   and there is no TRO in effect with respect to the attachment of

17   Defendants 1 through 163.

18       MR. ROSENBAUM:  I would just ask, your Honor, just --

19   if you can specifically put a sentence that the assets are no

20   longer to be frozen.  It's my understanding from deposing

21   countless witnesses in other cases with Amazon, that many of

22   these documents are read by untrained staff — not lawyers, not

23   paralegals, staff outside of Seattle — and the more simple it

24   is, the faster our clients will be back in business.

25       THE COURT:  Thank you.

N4HVJIAC

1        MR. ROSENBAUM:  Thank you, your Honor.

2        THE COURT:  Mr. Zhang and Mr. Fairchild, given that

3   the TRO is going to expire, I could rule on the preliminary

4   injunction, although I didn't -- I saw your application that

5   you were seeking to push that off.

6        What I'm going to say with respect to your preliminary

7   injunction is just to advise you of a couple of things:

8        One is that the standard for a preliminary injunction

9   is the same standard, as you know, for a TRO.

10       And the second thing that I'll advise is that you have

11  not provided any evidence that any of the defendants have been

12  served; and so, therefore, obviously I'm not going to enter a

13  preliminary injunction against individuals who have not even

14  been served yet.

15       And third, I am going to require that whatever

16  injunction you seek with respect to a preliminary injunction be

17  done individually for each of these defendants, with a showing

18  as to how you're likely to succeed on each of those

19  individually.  Because I'm no longer convinced that your group

20  pleading of any of this in representative samples is sufficient

21  or is -- I'm leery.  I'm leery of what you've placed before the

22  Court so far.  So you're going to have to show each one.

23       I might suggest that that will be a losing endeavor to

24  you, because of all that I've articulated regarding likelihood

25  of success on the merits and irreparable harm, I'm very

N4HVJIAC

1    convinced by some of the things that I've heard from

2    Mr. Isackson.  But I leave to you, if once you've served a

3    defendant, you choose to make a motion for a preliminary

4    injunction, you're going to have to make that showing.  But I

5    haven't seen any service and, therefore, I'm not going to rule

6    on those today.

7              Is there anything else, Mr. Zhang and Mr. Fairchild,

8    that we need to address today?

9              MR. ZHANG:  Your Honor, just as a supplement

10   information to defendants' counsel, it's going to be faster,

11   like we can -- the Amazon, there is a -- there is a guy who

12   contact me; and the Amazon staff, we contact through email.

13   And I can send the defendants like the -- only to the Amazon

14   defendants, because the eBay and the Wayfair and the Walmart,

15   they didn't -- seems like they don't take down the listing and

16   they don't reach out to me for further information.  And for

17   the Amazon, I can send just like Excel and with the ASINs and

18   the sellers' IDs to get the accounts for the reactive.

19             THE COURT:  I'm not sure I understand.

20             What I'd like you to do is I'm going to enter an order

21   tomorrow that essentially confirms that the TRO is not in

22   place.  I may add a few more details about what that exactly

23   means.

24             I'm going to require that that be served on all the

25   platforms that you sent the order to.  You should have only

N4HVJIAC

1    sent it to Amazon; but since you sent it to the other

2    platforms, I'm going to require that you send my revised order

3    to those other platforms as well.

4              Are you suggesting you'd like to send them something

5    else?

6              MR. ZHANG:  No, your Honor; just as a supplement

7    information to the defendants' counsel.

8              THE COURT:  Oh, that you're going to send something to

9    defendants' counsel as well?

10             MR. ZHANG:  No.  Because of the defendants' counsel is

11   worried about the account and assets being released

12   immediately; so, yes, just as a supplement information to this

13   Court, like, we can send, like, to -- your Honor can put in the

14   order like to send it through the -- send it Excel, like

15   contents, the sellers' ID and their, like, the listing numbers

16   to the Amazon -- to the Amazon and through email, and this way

17   get it faster than they expected.

18             THE COURT:  By all means.  If you can send something

19   to Amazon to have that happen faster tomorrow, that would be

20   greatly appreciated.  In fact, I am only entering another order

21   because I thought Amazon might want to see something from me,

22   as opposed to just hear from you that the different sites and

23   accounts can be unfrozen.  But if you'd like to do that in

24   addition, I think that's a good idea; and so that it can be

25   done faster tomorrow, I would appreciate that.  Thank you.

N4HVJIAC

1          And the other thing, before we close, is I'm going to

2     be getting submissions from Mr. Isackson in two weeks.  If

3     there is a submission from Ms. Hudak, for example, about

4     misjoinder or venue, etc., I would entertain that.

5          And, Mr. Rosenbaum, if there is a submission from you,

6     in addition to what you've put forth, maybe in connection with

7     Sell Below Cost or anyone else regarding patent invalidity or

8     anything like that, or any other relief that you're seeking, if

9     you're still in this case — it sounds like you and Sell Below

10    Cost are still in this case — I would welcome those submissions

11    as well.

12          MR. ROSENBAUM:  Yes, your Honor.  Thank you.

13          THE COURT:  Thank you.

14          And it's going to be unsealed today.

15          Anything else, Mr. Rosenbaum?

16          MR. ROSENBAUM:  No, your Honor.  Thank you very much.

17          THE COURT:  Okay.

18          And Ms. Hudak?

19          MS. HUDAK:  No, your Honor.  Thank you.

20          THE COURT:  Mr. Isackson?

21          MR. ISACKSON:  Nothing, your Honor.

22          Thank you for your attention.

23          THE COURT:  Okay.  Thank you for being here today.

24          So let's set some deadlines, if need be.

25          We're going to have -- tomorrow my order is going to

N4HVJIAC

1   go out.  Two weeks I'm going to hear from Mr. Isackson.

2              Ms. Hudak and Mr. Rosenbaum, whenever you send in your

3   items, if any, that would be fine.  And then I'll set down the

4   response time from the plaintiffs.

5              Again, I hope you hear me, Mr. Zhang and

6   Mr. Fairchild, that you're going to need to effectuate service

7   on individuals before you can seek any additional relief.  And

8   you should think hard about seeking any injunctive relief,

9   given what we've gone over here today.  I certainly won't

10  prejudge it, but I will look at things such as items that have

11  been raised here today.

12             I will also add, Ms. Hudak and Mr. Rosenbaum, if there

13  is any reluctance — and I haven't even looked at this — about

14  you putting in papers, given any issues you have with respect

15  to service or jurisdiction or anything like that, by no means

16  is my invitation meant to suggest that you must put anything

17  in.  You decide the best course of action.  I know, Ms. Hudak,

18  you've had this case for about 20 minutes.  So please just

19  decide what is best for you and your client in moving forward.

20             MS. HUDAK:  Thank you, your Honor.

21             THE COURT:  Thank you.  Thank you, Mr. Rosenbaum.

22             Okay.  Thank you, all.  Thank you to the court

23  reporter for staying so late in the day.

24             Court is adjourned.

25                          *    *    *